## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

SKINCURE ONCOLOGY, LLC
200 South Frontage Road
Suite 200
Burr Ridge, Illinois
60527

          Plaintiff,

v.

AMERICAN COLLEGE OF
MOHS SURGERY
555 East Wells Street
Suite 1100
Milwaukee, Wisconsin
53202-3823

          Defendant.

Case No.

## COMPLAINT

Plaintiff SkinCure Oncology, LLC brings this complaint for injunctive and monetary relief against Defendant American College of Mohs Surgery and alleges as follows:

## INTRODUCTION

1. Millions of Americans are diagnosed with nonmelanoma skin cancers every year. These patients deserve accurate and unbiased medical information so they can make informed decisions about treatment. But instead of providing the facts, the American College of Mohs Surgery (ACMS) has launched a campaign of misinformation, immediately injuring plaintiff SkinCure Oncology, LLC (SkinCure).

2. Mohs surgery, first developed in the 1930s, has been the standard treatment for nonmelanoma skin cancers for decades. Mohs surgery, however, has material downsides: A surgeon cuts away layers of skin to remove cancerous cells; patients may need repeated rounds of

surgery; and once complete, patients often have wounds that need care and surgical scarring may result.

3.     About a decade ago, a new competitor to Mohs surgery emerged: image-guided superficial radiation therapy, or IGSRT. IGSRT features the practical advantages of traditional radiation therapy—it is convenient for the patient, it is non-invasive, and there is no surgical recovery or wound care. There is no material risk of surgical scarring. Earlier forms of radiation therapy had a lower efficacy, however, because they were not sufficiently targeted. That is what IGSRT fixes: It combines the benefits of traditional radiation therapy with image-guided ultrasound imaging to achieve treatment success rates that the best available science indicates is on par with, or, according to some studies, statistically superior to, Mohs surgery.

4.     IGSRT—which is just as effective as Mohs surgery, but is non-surgical, does not risk scarring, and can be performed in a dermatologist's office—poses a threat to the continued market dominance of Mohs surgery. Indeed, IGSRT has surged in popularity in recent years because it is noninvasive and over 99% effective in treating nonmelanoma skin cancers. Alison Tran et al., *Analysis of image-guided superficial radiation therapy (IGSRT) on the treatment of early-stage non-melanoma skin cancer (NMSC) in the outpatient dermatology setting*, 149 J. of Cancer Rsch. & Clin. Oncol. 6283, 6287 (2023).

5.     SkinCure is a company that facilitates and provides IGSRT equipment and related services to dermatology offices; it is the market leader in IGSRT.

6.     Starting at least in 2023, ACMS and its agents have embarked on a targeted campaign of defamation and fearmongering in an effort to stop patients and physicians from accessing IGSRT. Indeed, at an ACMS meeting in 2024, the organization's leadership openly announced to members that it was making it a priority to target and attack SkinCure's business specifically.

7.     In particular, ACMS has distributed flyers containing false information about IGSRT to its members (and posted them publicly on its website) and instructed those members to

2

distribute them to patients and other doctors. Those flyers make false claims about the efficacy and side effects of IGSRT that appear to be based on old science regarding *traditional* radiation therapy, a less effective and more potentially risky treatment than IGSRT.

8.  For example, ACMS's patient-directed flyer states that cancer treated by IGSRT comes back in 1 in 20 cases when in fact IGSRT is over 99% effective at achieving local control of lesions. Lio Yu et al., *The Treatment of Non-Melanoma Skin Cancer with Image-Guided Superficial Radiation Therapy: An Analysis of 2917 Invasive and In Situ Keratinocytic Carcinoma Lesions*, 9 Oncol. Ther. 153, 153 (2021). And that over 99% rate of local control is maintained even five years after treatment. Tran, et al., *supra*, at 6287. Indeed, IGSRT-treated tumors are *less* likely to recur after two years than Mohs-treated tumors. Erin M. McClure et al., *Image-guided superficial radiation therapy has superior 2-year recurrence probability to Mohs micrographic surgery*, 43 Clin. and Transl. Radiat. Oncol. 1, 1 (2023).

9.  In addition to its publication of these flyers, ACMS, directly and through its agents, has repeated those false statements on multiple occasions at medical conferences and in communications with government regulators. The latest misleading public attacks on SkinCure and IGSRT by an ACMS board member took place only weeks ago.

10.  Moreover, ACMS's false communications about IGSRT contain thinly veiled (or, indeed, explicit) references to SkinCure in particular. Because it is the dominant market leader for IGSRT, when ACMS has intimated that "companies" are pushing IGSRT for "profit," notwithstanding what ACMS falsely claims are well-known risks and downsides to the procedure, that is a direct reference to SkinCure. ACMS's statements therefore contain the false, defamatory, and inflammatory implication that SkinCure is selling products and services for a profit that it knows are not in the best interests of cancer patients. Nothing could be further from the truth.

11.  The falsehoods must stop. ACMS's false and defamatory statements violate Section 43(a) of the Lanham Act and constitute both trade libel and defamation under Wisconsin law. The

3

Court should order injunctive and monetary relief to alleviate the harm SkinCure has suffered, and continues to suffer, as a result of ACMS's campaign of misinformation.

## PARTIES

12. Plaintiff SkinCure is the nation's leading provider of management and administrative services supporting dermatology practices that deliver IGSRT. SkinCure is a limited liability company organized under Delaware law; it maintains its principal place of business in Illinois.

13. Defendant American College of Mohs Surgery (ACMS) is a membership organization of fellowship-trained skin cancer and reconstructive surgeons specializing in the Mohs micrographic surgical technique used to treat skin cancer. ACMS is a non-profit organization under 26 U.S.C. § 501(c)(3) and maintains its principal place of business in Wisconsin.

## JURISDICTION AND VENUE

14. This Court has jurisdiction under 28 U.S.C. § 1331 because the complaint involves a federal question under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). The Court further has supplemental jurisdiction over the state law claims. Additionally, the Court has subject matter jurisdiction over all claims pursuant to 28 U.S.C. § 1332 because there is diversity between the parties and more than $75,000 in dispute.

15. This Court has personal jurisdiction over ACMS pursuant to Wis. Stat. § 801.05(1).

16. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

A. **SkinCure and IGSRT**

17. Skin cancers come in different forms. The most common types, affecting millions of Americans, are nonmelanoma skin cancers, which comprise primarily squamous cell and basal cell cancers.

18. Nonmelanoma skin cancers are susceptible to treatment by radiation, including superficial radiation therapy (SRT)—a type of radiation therapy that penetrates only the surface of

4

the skin, preventing deep tissue damage and limiting scarring. Indeed, doctors have used radiation to treat nonmelanoma skin cancers for over a century.

19. But traditional SRT has its downsides, including the use of relatively high-energy radiation over a relatively large area of skin, and published local control rates lower than certain surgical treatments. For example, one 2000 study showed local control rates at two and five years of 86.6% and 79.2%, respectively, for traditional SRT. *See* Yu et al. (2021), *supra*, at 153 (describing prior evidence).

20. Thus, in the decades prior to 2015, the use of traditional SRT to treat nonmelanoma skin cancers was on the downturn. Surgery had largely taken its place as a first-choice treatment. Specifically, doctors commonly turned to a type of surgery called Mohs micrographic surgery. This procedure, first developed in the 1930s, comprises an iterative skin removal process by which the surgeon removes the tumor and surrounding layers of skin until a microscopic inspection of the most recently removed layer of surrounding skin reveals no cancer cells. According to ACMS, Mohs surgery is an hours-long procedure that requires local anesthesia and post-operative wound care, and usually results in scarring. ACMS, *Mohs Surgery FAQs*, https://perma.cc/L75B-KLG4.

21. In 2015, however, the FDA authorized sales of the SRT-100 Vision, a device that combines a superficial radiation therapy machine—i.e., a machine that emits pulses of radiation, which penetrate only the surface level of the skin—with high-resolution imaging technology (specifically, an ultrasound machine). The imaging technology allows a doctor and her colleagues to find and measure a tumor, helping them to precisely target the pulses of radiation at the tumor. Radiation therapy incorporating this imaging technology is known as image guided superficial radiation therapy, or IGSRT.

22. Since 2015, doctors have treated tens of thousands of patients using IGSRT—with excellent results. Studies have shown that IGSRT "consistently delivers high cure rates (> 99%) with low complications for early stage (stage 0, I, or II) squamous cell and basal cell [cancers]."

5

Peyton M. Harris, et al., *The State of the Art of Image Guided Superficial Radiation Therapy Treatment of Non-melanoma Skin Cancer in Outpatient Dermatology Clinics in the United States and Review of the Literature*, 13 Oncol. Ther. 31, 31 (2024) (literature review analyzing published scientific evidence); *see also* Erin M. McClure et al., *Image-Guided Radiation Therapy Is Equally Effective for Basal and Squamous Cell Carcinoma*, 11 Dermatopathology 315, 315 (2024) (large retrospective cohort study of 20,069 nonmelanoma skin cancer lesions finding that IGSRT produced freedom from recurrence in over 99% of cases at 2, 4, and 6 years in both basal cell carcinoma and squamous cell carcinoma).

23. In short, IGSRT provides "LC [local control]/cure rates" that are "statistically superior to LC/cure rates obtained by SRT . . . without image guidance" and "comparable to those obtained by [Mohs surgery]," offering patients "an efficacious, non-invasive … non-surgical equivalent" to Mohs surgery. Harris et al., *supra*, at 45 (concluding that "IGSRT should be considered a first-line therapy in non-surgically treating early stage [nonmelanoma skin cancer] tumors") .

24. IGSRT is an especially valuable treatment for patients who are poor candidates for surgery (because of their age, other conditions, or location of the cancer), as well as for those who do not want surgery because of fear of invasive surgical cutting and resulting wound care, because of cosmetic concerns, or because the tumor is in a sensitive location.

25. It is also an important option for those with mobility challenges and those living in rural areas. IGSRT is almost always administered in community dermatology practices, which are readily available to many, including those living far from urban centers. On the other hand, 80% of counties lack a Mohs surgeon and 95% of rural Medicare beneficiaries lack access to the Mohs procedure.

26. Understandably, the use of IGSRT is increasing—and SkinCure has played a vital role in its growth. SkinCure does not perform IGSRT treatments; doctors and other clinicians do

6

that. But SkinCure helps ensure that medical providers can offer IGSRT by, among other things, providing SRT-100 Vision units, constructing and maintaining shielded vaults, supplying certified radiation therapists, and assisting with regulatory compliance. To date, SkinCure has partnered with 394 medical practices in 48 states, helping to treat more than 140,000 patients.

**B.      ACMS's Campaign of False Statements**

27.     The American College of Mohs Surgery has responded to this trend with a campaign of falsehoods directed at practitioners and patients, apparently motivated by a desire to maintain Mohs surgery as the "gold-standard" treatment at the expense of its growing rival, IGSRT. ACMS, a membership organization of "surgeons specializing in the Mohs micrographic surgical technique used to treat skin cancer," "serves as the voice of the specialty." ACMS, *About ACMS*, https://perma.cc/UKQ2-U2DY.

28.     In October 2023, ACMS's President, Dr. Sumaira Aasi, sent a newsletter to ACMS members sharing marching orders on the organization's new campaign to discredit IGSRT. Dr. Aasi warned ACMS members that although IGSRT was "decidedly inferior to Mohs surgery, marketing dollars spent by financially motivated companies could lead patients to think otherwise and impact referring physicians' decisions."

29.     Dr. Aasi accused "companies that sell and profit from SRT devices and equipment" of "seek[ing] to steer patients and referring physicians away from Mohs surgery with the allure of non-surgical treatment." It is clear that by "companies," Dr. Aasi is referring to SkinCure. Only two companies—Sensus Healthcare and SkinCure—currently market IGSRT devices, and SkinCure has a supermajority of the market.

30.     Dr. Aasi went on to falsely state that IGSRT "has inferior long-term cure rates" when compared with Mohs surgery. In fact, the opposite is true. IGSRT-treated lesions are *less* likely to recur after two years than Mohs-treated lesions. McClure et al. (2023), *supra*, at 1; *see* Harris et al., *supra*, at 45 (finding IGSRT cure rates and Mohs cure rates comparable).

31. Apparently unwilling to allow the science to speak for itself, Dr. Aasi "arm[ed]" ACMS members with two flyers: one aimed at "patients," and one aimed at "physicians and professional colleagues."

32. The first flyer Dr. Aasi disseminated was "designed for patients and makes clear in plain language the superiority of Mohs surgery." This flyer—which was published on the ACMS website and continues to be publicly available there—contains both (1) misleading statements of fact and (2) outright falsehoods about IGSRT and the Mohs procedure. *See* ACMS, *Mohs Surgery Versus Image Guided Superficial Radiation Therapy: Comparing the 2 Skin Cancer Treatments*, https://perma.cc/W6LP-PCE2. The patient flyer has since been placed on the public-facing websites of multiple ACMS surgeons, ostensibly to dissuade prospective patients from choosing IGSRT treatment. *See, e.g.*, Advanced Dermatologic Surgery & Ambulatory Surgery Center, *Mohs vs. Image-Guided Superficial Radiation Therapy (IGSRT): Why Surgery Still Leads for Most Non-Melanoma Skin Cancers*, https://perma.cc/BV58-PH7Z; Mark Abdelmalek, *Is Superficial Radiation Therapy for Skin Cancer Right for You?*, Dermatology of Philadelphia Mohs Surgery Center (Jun. 26, 2024), https://perma.cc/2ZQN-WFPE; Lifetime Skin Care Centers, *Mohs Surgery*, https://perma.cc/PHB9-43SR; Solano Dermatology Associates, *Don't be fooled by "NEW" Superficial Radiation Treatments*, https://perma.cc/7UNB-8Z8E.

33. The patient flyer is entitled "Mohs Surgery versus Image-Guided Superficial Radiation Therapy[:] Comparing the 2 Skin Cancer Treatments." It has an infographic with two columns listing paired "facts." The one on the left, colored in blue and topped by a microscope, lists "facts" about the Mohs procedure, while the one on the right, colored in crimson and topped by the well-known three-bladed radiation warning symbol, lists corresponding "facts" about IGSRT. Thus, for example, in the Mohs column, it says "[c]ost effective," while under IGSRT it says (ominously) "[v]ery expensive."

34. The first statement about IGSRT in the patient flyer is that "Radiation damages everything in its path, including healthy skin." This statement is misleading as applied to IGSRT because the imaging technology is used to carefully target cancerous skin cells, not healthy ones. By contrast, the flyer claims that "Mohs only removes the skin cancer, preserving healthy skin." Again, this is misleading, especially by comparison: While Mohs surgery is intended to minimize the removal of healthy skin as compared to less refined surgical techniques, it cannot claim to "only" remove cancerous cells.

35. The patient flyer's second statement about IGSRT is that "[t]here is no confirmation that the cancer has been removed." This is false. A treating doctor uses the imaging guidance at the end of a course of IGSRT to confirm that there is no cancer—and does so again six months later. The very premise of IGSRT is not only spatial accuracy, but perhaps more importantly, en-suring the cancer is regressing (and is ultimately gone) by repeatedly using precise ultrasound imaging.

36. Under the Mohs column, the patient flyer baldly states that the Mohs procedure "CURES skin cancer" (emphasis in original). This too is false. While the Mohs procedure is an effective treatment for many patients, no treatment can claim—full stop, with no caveats—to cure cancer.

37. Back to the IGSRT column, the patient flyer states that IGSRT "[c]an cause more skin cancers." This is blatantly false. SkinCure does not know of a single cited case of a secondary induced skin cancer caused by IGSRT.

38. The patient flyer next asserts that "[a]t least 1 in 20 [cancers] will come back" after using IGSRT, a "fact" that is contrasted with Mohs surgery's "[o]ver 99% cure rate." This is false. There is no scientific basis for this assertion. The best evidence available demonstrates that 99% of patients treated with IGSRT remain cancer-free for years. Rania Agha et al., *Image-Guided Superficial Radiation Therapy for Basal and Squamous Cell Carcinomas Produces Excellent*

9

*Freedom from Recurrence Independent of Risk Factors*, 13 J. Clin. Med. 5835 (2024) (retrospective cohort study of recurrence rates in 19,988 IGSRT-treated lesions found that 99.68% of patients were free from recurrence at two years, and 99.54% of patients were free from recurrence at four and six years); *see also* Harris et al., *supra*; McClure et al. (2024), *supra*; McClure et al. (2023), *supra*; Tran et al., *supra*; Yu et al. (2021), *supra*.

39. Indeed, IGSRT-treated lesions are *less* likely to recur after two years than Mohs-treated lesions. McClure (2023), *supra*; *see also* Harris et al., *supra* at 41 ("Overall, these studies . . . demonstrate" that IGSRT "consistently achieves ≥99% cure rates for [nonmelanoma skin cancers] in a dermatological clinical setting, which is comparable and statistically superior on early analysis to cure rates achieved by" Mohs surgery).

40. The patient flyer then claims that "[s]kin irritation, blistering, peeling, color change, hair loss, tooth decay, and damage to salivary glands are common side effects" of IGSRT. But while these may have been side effects of older, high-dose radiation therapies, modern IGSRT protocols do not cause blistering, tooth decay, or damage to salivary glands.

41. Also in the IGSRT column, the patient flyer states that IGSRT has an "unpredictable long-term cosmetic outcome." This too is false. There is no scientific basis for the conclusion that patients receiving IGSRT face unforeseen cosmetic issues. Indeed, the evidence indicates that IGSRT typically results in *better* cosmetic outcomes for patients compared to Mohs surgery. Tran et al., *supra*, at 6283 ("IG-SRT has a high safety profile, can achieve superior cosmesis and should be considered first-line for treating early-stage NMSC tumors as cure rates have been shown to be effective in all NMSC on early follow-up."); Danny Zakria et al., *The Role of Image-Guided Superficial Radiation Therapy in the Treatment of Nonmelanoma Skin Cancer*, 9 SKIN 2042, 2046 (Jan. 2025) ("Because studies have shown that IGSRT typically results in favorable cosmetic outcomes, in some cases it may be a preferred option for patients who want to optimize cosmesis."); McClure et al. (2023), *supra*, at 2 (Unlike Mohs, which requires surgery, IGSRT "eliminates the

10

concern for wound infection, dehiscence, bleeding," and "hematoma formation."); Lio Yu et al., *Enhancing Cosmesis While Achieving High Cure Rates for Early Stage Non-Melanoma Skin Cancer in the Outpatient Dermatology Clinic Using a Novel Non-Invasive Modality*, 4 Clin. Dermatology: Rsch. & Ther. 1, 5 (2022).

42. Finally, the flyer directs patients to ACMS's website: "To stay informed, visit MohsCollege.org."

43. Dr. Aasi "encourage[d]" ACMS members to "use and share" this patient flyer with their "patients" to "help educate"—or, more accurately, misinform—them on the risks associated with IGSRT, and to "prevent misinformation from taking hold," an apparent reference to SkinCure's own accurate promotion of IGSRT.

44. The second flyer Dr. Aasi distributed to ACMS members, the physician flyer, was "designed for physicians and professional colleagues who see or refer skin cancer patients." This physician flyer is also available at ACMS's website. *See* ACMS, *Physician Flyer*, https://perma.cc/3CCR-KNG8. This more detailed physician flyer focuses on SRT more generally—not IGSRT in particular. It includes a chart purporting to show that SRT is less effective than Mohs and it states among other things that "SRT has recently been highly promoted by companies that sell and profit from SRT devices and equipment"—another thinly veiled reference to SkinCure. As applied to IGSRT, the chart contains misleading information (including about the recurrence rates for cancers) because it relies on outdated studies, which do not account for current IGSRT technology and usage. And the statement regarding SRT's promotion, combined with its statements about lack of efficacy, lead to the inflammatory implication that SkinCure and others have promoted IGSRT for profit even though they know it to be ineffective.

45. Dr. Aasi similarly "encourage[d]" ACMS members to "use and share" this physician flyer with their "colleagues" to "help educate"—or, more accurately, misinform—them on

the risks associated with IGSRT, and to "prevent misinformation from taking hold," an apparent reference to SkinCure's own accurate promotion of IGSRT.

46. In response to the ACMS flyers and newsletter, SkinCure's then chief medical officer sent a letter to Dr. Aasi in November 2023, expressing concern about the communications' false and misleading statements and encouraging ACMS to "issue a corrective update to the entire membership" so that ACMS members could "accurately understand the benefits of IGSRT." Among other things, the letter provided citations to recent scholarship demonstrating IGSRT's 99% effectiveness, including the Yu et al. (2021), Tran et al., and McClure et al. (2023) studies cited herein. And, the letter plainly explained the most glaring problem with ACMS's communications: "You can't quote old cure rates from SRT studies when you are discussing the cure rate of IGSRT. SRT cure rates are much lower than those of IGSRT. These two therapies, SRT and IGSRT are not the same." (footnotes omitted).

47. SkinCure's letter also expressed a desire to "collaborate" with ACMS "for the benefit of our patients." ACMS did not respond to the letter, did not issue a correction to its members, and kept its false and misleading flyers published on its website.

**C.   ACMS continues its misinformation campaign.**

48. Rather than correcting the record, ACMS has doubled down on its misinformation campaign, repeating the same false talking points in multiple forums over the past two years, including at medical conferences and in interactions with government regulators.

49. Indeed, SkinCure has been told by multiple physicians that, at ACMS's annual meeting in Phoenix, Arizona, in May 2024, ACMS leadership announced to members that the organization would be making it a priority to target SkinCure specifically, and that it was planning to take down IGSRT. This statement indicates that ACMS sees a significant interest for its members in disrupting SkinCure's business of making IGSRT available to doctors and patients. That is, ACMS, acting on behalf of its members, has a clear financial incentive to cause more patients

to receive Mohs surgery (which they perform) rather than receive IGSRT, which need not be performed by a Mohs surgeon. ACMS is thus making these false and misleading statements about IGSRT and Mohs surgery with an intent to benefit the financial interests of its members and to injure the business of SkinCure.

50. In just the latest example, Dr. Glenn Goldman—a Mohs surgeon, current board member of ACMS, and the organization's past president—gave a presentation about IGSRT at an online meeting of the New England Dermatological Society hosted by the University of Vermont on March 14, 2026.

51. This presentation included PowerPoint-type slides and specifically referenced GentleCure—the name of SkinCure's product. In addition to ACMS's standard anti-IGSRT talking points, Dr. Goldman bragged about the role he played in reducing or eliminating Medicare coverage for IGSRT, claiming that he went to Washington D.C. and met with senators to get Medicare to stop covering IGSRT.

52. In addition, Dr. Goldman singled out individual IGSRT practitioners for shaming. And he made unsubstantiated claims associating IGSRT with osteoradionecrosis—a serious potential side effect of high-dose radiation for which there is no evidence of causation by IGSRT—and suggesting claims of malpractice for using IGSRT.

53. In addition to Dr. Goldman's remarks at the March 14 meeting, other agents of ACMS have similarly attacked SkinCure and IGSRT publicly, including Dr. Brent Moody, Dr. Sumaira Aasi, Dr. Dan Seigel, and Dr. Howard Rogers.

**D.      ACMS's False Statements to CMS**

54. ACMS has also directed its false and misleading anti-IGSRT message toward the federal government and its contractors, to dissuade them from providing Medicare coverage for IGSRT. Unfortunately, it has found success doing so.

55. In 2025, the Centers for Medicare and Medicaid Services (CMS), the component of the Department of Health and Human Services that administers Medicare, issued a proposed rule addressing, among other things, how certain treatments—including IGSRT—should be covered by Medicare. Medicare and Medicaid Programs; CY 2026 Payment Policies Under the Physician Fee Schedule and Other Changes to Part B Payment and Coverage Policies; Medicare Shared Savings Program Requirements; and Medicare Prescription Drug Inflation Rebate Program, 90 Fed. Reg. 32352 (July 16, 2025).

56. The proposed rule indicated, among other things, that CMS planned to no longer cover the cost of image guidance with each dose of radiation, or fraction. *See* 90 Fed. Reg. at 32406.

57. SkinCure submitted a comment letter to CMS in September 2025 objecting to several of CMS's proposed changes, including the proposal to refuse to cover the use of image guidance per fraction. SkinCure explained that the proposed rules' approach to coverage would "disrupt established clinical protocols," which call for the use of imaging guidance with each dose of radiation.

58. ACMS, for its part, responded to CMS's IGSRT-related proposals in a comment letter laced with false statements. In the letter, ACMS writes, "Superficial Radiation Treatment, particularly when performed with simulation and ultrasound guidance, is not widely used across the dermatology specialty. Rather, the combination of these services are delivered by a small but growing subset of dermatologists operating outside of recognized clinical guidelines for skin cancer treatment." This statement is doubly false. First, IGSRT is widely used. Doctors have treated tens of thousands of patients using this innovative and effective therapy. Indeed, SkinCure has practice partners in 48 states and has facilitated IGSRT treatment for more than 140,000 patients.

59. Second, the doctors who treat patients with IGSRT are not "operating outside of recognized clinical guidelines." Indeed, thirty decisions by Qualified Independent Contractors and

Administrative Law Judges—who provide, respectively, the second and third levels of review in the Medicare appeals process—have determined that IGSRT is medically reasonable and necessary for the treatment of cancer.

60. The letter also states that the use of ultrasound to help treat superficial skin cancers is "widely considered low-value care." But IGSRT is not "widely considered low-value care." For example, in January of last year, the Dermatology Association of Radiation Therapy (DART), a national non-profit medical society, "announced that a panel of experts in nonmelanoma skin cancer (NMSC) management had reviewed the scientific literature and created recommendations on the role of Image-Guided Superficial Radiation Therapy (IGSRT), reaching consensus that IGSRT is a safe and effective treatment for NMSC that often results in highly favorable cosmetic outcomes." *See* Dermatology Association of Radiation Therapy, *In Journal SKIN, Expert Dermatology Panel Reports Image-Guided Superficial Radiation Therapy Safe & Effective, and a First-Line Treatment Option in Selected Cases of Nonmelanoma Skin Cancer*, PR Newswire (Feb. 12, 2025), https://perma.cc/59QW-NSM7; *see also* Zakria et al., *supra*, at 2046.

61. Ultimately, with the support of ACMS's letter (along with other comments), CMS stuck with its flawed approach, including by refusing to cover ultrasound imaging per fraction, as the protocol requires. *See* Medicare and Medicaid Programs; CY 2026 Payment Policies Under the Physician Fee Schedule and Other Changes to Part B Payment and Coverage Policies; Medicare Shared Savings Program Requirements; and Medicare Prescription Drug Inflation Rebate Program, 90 Fed. Reg. 49266 (Nov. 5, 2025). Medicare reimbursement for a course of IGSRT has dropped precipitously, from its previous average of around $11,922 to around $3,692. This reduction in compensation will limit the number of practices that can offer IGSRT, reduce the number of patients who receive IGSRT, and cost SkinCure about $4,445 per course of treatment. In other words, ACMS's letter harmed SkinCure's reputation, and will reduce its goodwill, revenue, and profits.

15

62. Relatedly, last year, five of the twelve relevant Medicare Administrative Contractors (MACs)—private companies that administer the Medicare program in a geographic jurisdiction—determined, using their power to make local coverage determinations,[1] that they would not cover the use of imaging technology with superficial radiation therapy. This effectively means that these five MACs will not cover IGSRT. This decision too will reduce the availability of IGSRT, the number of patients receiving IGSRT, and SkinCure's revenue. In turn, SkinCure will lose—and has lost—revenue and profit.

63. Prior to reaching this decision, the MACs, on information and belief, received letters or other communications from ACMS and its agents containing the same kinds of misleading and false statements that ACMS included in its flyers and letter to CMS.

64. This campaign to influence Medicare decisionmakers into reducing coverage for IGSRT has directly harmed SkinCure. Indeed, in just one example, a multi-office dermatology practice recently terminated its agreement with SkinCure and discontinued IGSRT services; even while praising SkinCure's service and the practice's experience with IGSRT's effectiveness, the practice indicated that it could not continue to offer IGSRT given the changed regulatory conditions.

**E.      ACMS's actions harm SkinCure.**

65. In addition to the obvious impact of ACMS's inducement of CMS and its MACs to reduce Medicare coverage for IGSRT, the falsehoods spread by ACMS and its agents have directly harmed SkinCure both monetarily and reputationally.

---

[1]  Local coverage determinations are decisions made by MACs regarding whether or not a particular item or service will be covered under Medicare Part A or Part B within their jurisdictions; these decisions are binding on the MACs, though they are not binding at subsequent levels of review.

66. As discussed above, ACMS and its agents have disseminated false information about IGSRT, including but not limited to the patient flyer and physician flyer, directly to ACMS's members and other physicians. This has the natural effect of dissuading—and in fact has dissuaded—physicians from partnering with SkinCure to offer IGSRT, imposing direct monetary harms on SkinCure.

67. ACMS members, and Mohs surgeons generally, are among SkinCure's potential physician partners. Indeed, of SkinCure's existing partners, over 60% offer Mohs surgery at the same practice, and over 20% are members of ACMS. Thus, the audience of physicians that has received ACMS's direct false statements is a pool of doctors who are potential buyers of SkinCure's products and services. And that is to say nothing of the recipients of ACMS's false statements at general dermatology conferences and other venues that are not focused on Mohs surgery.

68. That is not hypothetical. In a count that is surely underinclusive, over a dozen doctors over the past three years have explicitly indicated to SkinCure that they were declining to partner with SkinCure precisely because they had concerns about IGSRT or preferred Mohs surgery, demonstrating the effect of ACMS's statements.

69. Similarly, ACMS has both encouraged its members to distribute the patient flyer to patients and has posted that flyer directly on its public website. The flyer now appears on many individual medical practices' websites as well. This has the natural effect of dissuading—and in fact has dissuaded—patients from pursuing IGSRT, imposing direct monetary harms on SkinCure, which typically provides its equipment and services to doctors in exchange for a share of future treatment revenues.

70. For example, treatment volume at many practices that do continue to partner with SkinCure to offer IGSRT has been depressed by ACMS's campaign. SkinCure typically works collaboratively with practices to forecast treatment volumes prior to launching IGSRT services at that practice. At a significant number of practices, actual treatment volumes have been

17

significantly lower than projected during the relevant period—i.e., after ACMS's false statements began to be distributed to physicians and patients—reflecting the effects of ACMS's misinformation.

71.     In addition, ACMS's repeated suggestion that "companies"—which, in practice, means SkinCure, which has a supermajority of the IGSRT market—are "steer[ing]" patients to IGSRT based on a "profit" motive, notwithstanding what ACMS falsely claims are its known clinical downsides, imputes unethical behavior and a lack of integrity to SkinCure that is defamatory and harmful to its reputation.

### CLAIMS FOR RELIEF

### COUNT I
### LANHAM ACT, 15 U.S.C. § 1125(A)

72.     SkinCure realleges and incorporates by reference the foregoing paragraphs.

73.     ACMS's false representations regarding the safety and efficacy of IGSRT violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), because they are "material false statement[s] of fact" that have a "tendency to deceive" dermatologists and patients. *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381-382 (7th Cir. 2018).

74.     ACMS has advertised and promoted Mohs surgery in interstate commerce by making statements about IGSRT that are both misleading and literally false. *See id.* ("A literally false statement will necessarily deceive consumers, so extrinsic evidence of actual consumer confusion is not required."). These statements have been posted to the Internet and otherwise transmitted in interstate commerce via email.

75.     ACMS's misleading and literally false representations—which have been disseminated to doctors and patients via the flyers shared with ACMS members and publicly available on the ACMS website—have caused dermatologists to decline to partner with SkinCure to offer

IGSRT, and have caused patients to choose Mohs surgery over SkinCure's IGSRT, both of which harm SkinCure's sales and profits, business relationships, and goodwill.

76. ACMS's acts were willful, malicious, egregious, and in bad faith, as demonstrated, for example, by its explicit statements to members that it intended to harm SkinCure's business.

## COUNT II
## TRADE LIBEL

77. SkinCure realleges and incorporates by reference the foregoing paragraphs.

78. Trade libel consists of "the publication of matter disparaging the quality of another's land, chattels or intangible things, that the publisher should recognize as likely to result in pecuniary loss to the other through the conduct of a third person in respect to the other's interests in the property." Restatement (Second) of Torts § 626 (Am. L. Inst. 1977); *see Next Techs. Inc. v. Beyond the Office Door, LLC*, 992 F.3d 589, 592-593 (7th Cir. 2021) (concluding that Wisconsin courts would apply the Restatement with respect to trade libel claims). The publisher must know that the disparaging material "is false or act[ ] in reckless disregard of its truth or falsity." Restatement (Second) of Torts, § 623A (Am. L. Inst. 1977). The publication "may be in writing or it may be oral." *Id.*

79. ACMS and its agents have published materials, such as the patient flyer and physician flyer (published on its website and distributed to ACMS members), 2023 newsletter, statements at conferences and elsewhere, and communications to CMS, that disparage—including through false statements—SkinCure's products and services.

80. ACMS should have recognized that its publication of these disparaging materials would result in pecuniary loss to SkinCure through the conduct of third persons—i.e., physicians, patients, and government officials.

81. SkinCure has suffered direct pecuniary harm, in the form of lost revenue and profits, because of ACMS's misleading, false, and disparaging statements in its publications. Those

harms occurred in the manner described above: ACMS's statements caused physicians to decline to partner with SkinCure, denying SkinCure the revenues that would have resulted from those partnerships. And the statements also reached (as was intended) patients; those patients opting for Mohs surgery over IGSRT, decreasing demand for the treatments SkinCure facilitates, have directly harmed SkinCure's revenues as well. SkinCure has also lost goodwill and experienced harm to its reputation because of these publications.

82. To the extent necessary, ACMS acted with knowledge or reckless disregard that its statements were false. Not only is the science itself clear, but ACMS was provided directly with the science and explanations of why its statements were wrong, yet it persisted in its falsehoods. And ACMS's intent is underscored by its explicit statements to members that it intended to harm SkinCure's business.

### COUNT III
### DEFAMATION

83. SkinCure realleges and incorporates by reference the foregoing paragraphs.

84. Defamation consists of "a false statement that was communicated to a third person that is unprivileged and capable of defamatory meaning." *Wagner v. Allen Media Broad.*, 3 N.W.3d 758, 768 (Wis. Ct. App. 2024).

85. ACMS and its agents have made false statements—including through its patient flyer and physician flyer (published on its website and distributed to ACMS members), 2023 newsletter, statements at conferences and elsewhere, and communications to CMS—that were communicated to third persons, such as doctors, patients, and government officials.

86. ACMS's false statements were unprivileged.

87. ACMS's false statements were capable of defamatory meaning because they would tend to harm SkinCure's reputation "so as to lower [SkinCure] in the estimation of the community; deter third persons from associating or dealing with [SkinCure]; or excite adverse, derogatory or

20

unpleasant feelings or opinions against" SkinCure. *Wagner*, 3 N.W.3d at 769 (quotation marks omitted).

88.    ACMS's written defamatory statements are actionable per se without the need to allege or prove special damages. *Martin v. Outboard Marine Corp.*, 113 N.W.2d 135, 139 (Wis. 1962). ACMS's oral defamatory statements are both actionable per se because they imply unfitness and affect SkinCure in its business and profession, and alternatively resulted in special damages in the manner described above: They caused physicians to decline to partner with SkinCure, denying SkinCure the revenues that would have resulted from those partnerships; and have also decreased patient demand for the IGSRT procedures SkinCure facilitates.

89.    To the extent necessary, ACMS acted with knowledge or reckless disregard that its statements were false. Not only is the science itself clear, but ACMS was provided directly with the science and explanations of why its statements were wrong, yet it persisted in its falsehoods. And ACMS's intent is underscored by its explicit statements to members that it intended to harm SkinCure's business.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

1.  Enter judgment in its favor against ACMS;

2.  Enjoin ACMS from making false claims, either directly or by implication, directly or through its agents, about IGSRT or about SkinCure;

3.  Order ACMS to remove the statements described herein from its website;

4.  Order ACMS to publish appropriate corrective advertisements and statements;

5.  Issue a declaratory judgment that Defendant's statements regarding IGSRT and SkinCure are false;

6.  Award SkinCure compensatory damages in an amount to be determined at trial;

7. Award SkinCure its costs in bringing this action, including reasonable attorneys' fees and expenses;

8. Award SkinCure such other relief as the Court may deem just and proper.

## JURY DEMAND

SkinCure demands a trial by jury as to all claims and issues so triable.

Dated: March 27, 2026

Respectfully submitted,

/s/ *Michael Dockterman*

Paul W. Hughes (application to be filed)
Andrew A. Lyons-Berg (application to be filed)
Justin M. Sandberg (application to be filed)
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mcdermottlaw.com

Michael Dockterman
MCDERMOTT WILL & SCHULTE LLP
444 West Lake Street
Chicago, IL 60606
(312) 372-2000
mdockterman@mcdermottlaw.com

*Counsel for Plaintiff*
*SkinCure Oncology, LLC*

22